**WO**                    NOT FOR PUBLICATION

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Todd Candelaria, *et al.*, | No. CV-14-02123-PHX-JJT |
| Plaintiffs, | **ORDER** |
| v. | |
| Tolleson, City of, *et al.*, | |
| Defendants. | |

At issue is Defendants George Good, Wendy Jackson, Reyes Medrano, and City of Tolleson's Motion for Summary Judgment (Doc. 61, MSJ), to which Plaintiffs Todd Candelaria and Jeff Hamm filed a Response (Doc. 65, Resp.) and Defendants filed a Reply (Doc. 67, Reply). For the reasons that follow, the Court finds that Plaintiffs have not shown there is a genuine dispute as to any material fact of their claims and Defendants are entitled to judgment as a matter of law. The Court therefore grants Defendants' Motion for Summary Judgment.

## I.      BACKGROUND

Plaintiffs Mr. Candelaria and Mr. Hamm, who work as firefighters for Defendant City of Tolleson (the City), brought this case in response to disciplinary actions their employer took against them. Defendant Mr. Good is Chief of the City's Fire Department, Defendant Ms. Jackson is the City's Human Resources Director, and Defendant Mr. Medrano is the City Manager.

Plaintiffs are active members of the United Valley Firefighters Association, International Association of Fire Fighters, Local 3449 (the "union"), a local labor

1  association of firefighters and emergency medical and rescue service providers. During
2  the time material to this case, Mr. Candelaria was president of the union, and Mr. Hamm
3  was vice president. Plaintiffs allege that Defendants took disciplinary actions against
4  them in retaliation for their participation in the union's ongoing effort to pass a meet and
5  confer policy in the City of Tolleson and the union's provision of relief services for the
6  City of Prescott following a massive fire in Yarnell Hill (the "Yarnell Hill Fire")
7  (collectively, the "alleged union activities").

8        **A.**    **The Yarnell Hill Fire Relief Efforts**

9        The following facts are undisputed unless otherwise indicated. On June 30, 2013,
10  19 firefighters were killed while fighting the Yarnell Hill Fire near Prescott, Arizona.
11  (Doc. 62, Defendants' Statement of Facts in Support of Summary Judgment (DSOF),
12  Ex. A, Declaration of George Good (Good Decl.) ¶ 2.) The next day, at the instruction of
13  the Professional Fire Fighters of Arizona ("PFFA"), the union began looking for
14  volunteers to provide relief assistance in Prescott. (Doc. 66, Plaintiffs' Response to
15  Defendants' Statement of Material Facts and Statement of Additional Material Facts
16  (PSOF), Ex. U.) On July 4, 2013, Bryan Jeffries, then vice president of the PFFA,
17  contacted Chief Good by email to request assistance from the Tolleson Fire Department.
18  (DSOF, Ex. B, Deposition of George Good (Good Dep.) at 87:11-25.) Chief Good
19  decided to send Captain Jon Mecum and his crew to provide relief assistance to Prescott
20  on July 13, 2013. (Good Dep. at 88:12-17.)

21        At some point, Mr. Candelaria, on behalf of the union, arranged for a sign-up sheet
22  to be placed at the City fire department for firefighters who wished to volunteer in
23  Prescott. (Good Decl. ¶ 5.) When Jerald Franzmeier, a City firefighter who is not a union
24  member, went to sign up to volunteer, Mr. Candelaria told him that he could not
25  participate because only union members could volunteer. (DSOF, Ex. E, Deposition of
26  Jerald Franzmeier (Franzmeier Dep.) at 23:15-22.) A couple of hours later, after
27  Mr. Candelaria learned he had upset Mr. Franzmeier, he apologized to him. (DSOF,
28  Ex. D, Deposition of Todd Candelaria (Candelaria Dep.) at 24:14-16; Good Decl. ¶ 5.)

1   As the City fire department prepared to send Mr. Mecum's crew to provide relief

2   services to Prescott, Mr. Candelaria received a phone call from Ray Maione, a PFFA

3   representative. (DSOF, Ex. F, Deposition of Ray Maione (Maione Dep.) at 43:3-44:1.)

4   Mr. Maione told Mr. Candelaria that if the City fire department sent a relief crew with

5   non-union members, their truck would be rejected when it reached Prescott. (Maione

6   Dep. at 44:3-45:1.) However, Tim Hill, then-president of the PFFA, testified that he was

7   not aware of anyone reaching out on behalf of the union to any fire department to state

8   that relief services from non-union members would not be welcome. (DSOF, Ex. G,

9   Deposition of Tim Hill (Hill Dep.) at 22:19-24.) Mr. Hill further testified that he would

10   not have sanctioned that message. (Hill Dep. at 22:19-25.) Mr. Jeffries also testified that

11   he would not have sanctioned that message. (DSOF, Ex. H, Deposition of Bryan Jeffries

12   (Jeffries Dep.) at 45:3-15.) Mr. Jeffries did state "there was a lot of confusion" and

13   people were "getting limited information," and "there might have been a lack of clarity

14   about what role the association [was] playing at any particular time." (Jeffries Dep. at

15   48:22-49:5.)

16   After Mr. Candelaria's phone call with Mr. Maione, he spoke with Mr. Hamm,

17   and they agreed that Mr. Hamm would relay the message to Mr. Mecum. (Candelaria

18   Dep. at 41:4-11.) When Mr. Mecum heard the message, he said he would "have to think

19   about" what to do about Mr. Franzmeier, the only non-union member scheduled to be on

20   the July 13 relief crew. (DSOF, Ex. J, Deposition of Jonathan Mecum (Mecum Dep.) at

21   36:1-3, 38:22-39:3.) A day or two later, Mr. Mecum told Mr. Hamm that Mr. Franzmeier

22   would be "staying right where he's at," implying that Mr. Franzmeier would still

23   participate in the relief efforts. (Mecum Dep. at 39:6-9.) Consequently, Mr. Franzmeier

24   went as part of Mr. Mecum's crew to Prescott on July 13, and everyone in the crew was

25   allowed to participate in the relief assistance. (Mecum Dep. at 39:23-40:1.)

26   **B.    Mr. Franzmeier's Attempted Resignation and the City's Investigation**

27   On July 15, 2013, Mr. Franzmeier had a conversation with Mr. Mecum that

28   prompted Mr. Franzmeier to seek resignation from the City fire department. (Franzmeier

Dep. at 49:12-19, 49:23-27, 51:1-4.) According to Mr. Franzmeier, Mr. Mecum expressed concern about possible repercussions of going against union wishes by allowing Mr. Franzmeier to participate in the relief efforts. (Franzmeier Dep. at 50:6-15.) Mr. Franzmeier also testified that there had been a rumor circulating among fire department employees about Mr. Mecum going against union wishes that was "something to the effect if you're not on the train, you're going to be run over it," referring to supporting the union. (Franzmeier Dep. at 51:17-24.) During their conversation, Mr. Franzmeier told Mr. Mecum that because of these concerns, he was going to Human Resources to resign. (Franzmeier Dep. 49:12-50:8.) Mr. Mecum then told Chief Good about Mr. Franzmeier's plan to resign, and Chief Good immediately informed City Manager Mr. Medrano. (Good Dep. at 70:10-71:6.) Mr. Medrano called Human Resources Director Ms. Jackson and warned her not to accept Mr. Franzmeier's resignation. (DSOF, Ex. K, Deposition of Reyes Medrano (Medrano Dep.) at 43:6-11.)

Mr. Franzmeier met with Mr. Medrano and Chief Good to explain his concerns, which included, according to Mr. Medrano, a "worry that his lack of affiliation with the fire union could lead to bodily harm [of him or] his friends, specifically Jon Mecum." (Medrano Dep. at 44:6-19.) After the meeting, Mr. Medrano called the City of Tolleson's Police Chief, Larry Rodriguez, and asked him to conduct an administrative investigation into the issues underlying Mr. Franzmeier's concerns. (Medrano Dep. at 21:9-12, 49:21-53:6, 51:8-14.)

On August 30, 2013, Mr. Rodriguez issued the investigative report, entitled Tolleson Police Memorandum (the "Memorandum"). (Rodriguez Dep. at 13:7-18; DSOF, Ex. P, Tolleson Police Memorandum.) The Memorandum concluded that Mr. Candelaria had "den[ied] a subordinate employee the opportunity to volunteer for an assignment solely because the employee was a non-union member." (Tolleson Police Memorandum at 18.) In addition, it found that Mr. Candelaria had directed a subordinate, Mr. Hamm, to "threaten another fire Captain that an assigned Tolleson fire engine would be turned away because it had a non-union member on the crew." (Tolleson Police Memorandum at 18.)

1    The Memorandum noted that "union orders to Tolleson fire personnel do not supersede
2    City of Tolleson policy" and that Mr. Candelaria's action had "attempted to countermand
3    an assignment of a duly authorized fire response unit," which was "outside of
4    Candelaria's authority." (Tolleson Police Memorandum at 18.) It concluded that
5    Mr. Candelaria had engaged in misconduct by failing to fulfill his duties as a supervisor,
6    violating the City's Anti-Harassment and Discrimination policy, and not being
7    forthcoming in the investigation. (Tolleson Police Memorandum at 18-19.) The
8    Memorandum also found that Mr. Hamm "knowingly disregarded the operational
9    directives of the Fire Department by injecting a union bias based solely on the fact that a
10   non-union firefighter was part of the fire crew" and had thereby violated the City's Anti-
11   Harassment and Discrimination policy. (Tolleson Police Memorandum at 19.)

12   **C.    The Disciplinary Actions Against Plaintiffs**

13   In response to the Memorandum, Chief Good took disciplinary action against
14   Mr. Candelaria and Mr. Hamm. Chief Good recommended that Mr. Candelaria be
15   demoted from his position as Captain to firefighter. (Good Dep. at 119:9-11.) During a
16   meeting with Mr. Medrano and Chief Good regarding potential disciplinary actions,
17   Mr. Candelaria stated "the emotions of the day may have gotten . . . [sic] the day the 19
18   firemen died and maybe I could have handled that a little bit better." (Good Decl. ¶ 6.)
19   Mr. Medrano ultimately decided to only discipline Mr. Candelaria with a five shift
20   suspension. (Good Decl. ¶ 8; Medrano Dep. 104:2-13; PSOF, Ex. Q.) Chief Good also
21   issued a disciplinary notice—a written warning for insubordination—to Mr. Hamm.
22   (Good Dep. 140:14-18; PSOF, Ex. W.) In Chief Good's disciplinary meeting with
23   Mr. Hamm, Mr. Hamm acknowledged that he "learned something" and described the
24   incident as a "growing experience." (Good Decl. ¶ 15.) Mr. Hamm said that he "would
25   understand if [Chief Good] would have a trust issue" because of his conduct. (Good Decl.
26   ¶ 18.)

27
28

### D.      The Meet and Confer Proposal

For many years, the union has advocated for the Tolleson City Council to pass and implement a meet and confer policy. Mr. Candelaria testified that the proposed meet and confer policy would involve the firefighters' rights and their ability to "discuss their working conditions." (Candelaria Dep. at 77:12-13.) Mr. Hamm stated that the union wanted a meet and confer policy "so we would have a seat at [the] table and influence— or have some say in the policies that are created and the way that our membership is treated." (Hamm Dep. at 39:13-17.) According to Mr. Candelaria, a meet and confer policy has been a union priority since he became union president in 2000. (Candelaria Dep. at 47:14-21, 48:16-17.) He testified that in late 2012 or early 2013, the union started increasing pressure on the Tolleson City Council—making a "hard push"—to consider a meet and confer policy. (Candelaria Dep. at 48:12-20.)

Mr. Candelaria stated that as part of the "hard push," the union obtained advice from PFFA and a public relations firm about how to best advocate for a meet and confer policy. (Candelaria Dep. at 54:1-7.) The union also formed a political action committee but did not spend any related funds. (Candelaria Dep. at 62:20-63:2, 64:17.) Mr. Candelaria testified that at some point he had conversations about a meet and confer policy with Mr. Medrano, Chief Good, and possibly some city council members, although he could not remember specifically. (Candelaria Dep. at 77:15-22.) He never made any advocacy efforts in a Tolleson City Council meeting, however, or raised the issue with members of the public. (Candelaria Dep. at 77:23-25; 78:1-20.)

The union also engaged in some written communication advocating for a meet and confer policy. In 2008, Mr. Candelaria sent an email to Mayor Gamez that advocated for the Mayor to let go of his "strong reservations with regards to the meet and confer process." (Candelaria Dep. 48:24-51:10; DSOF, Ex. R, May 1, 2008 Email.) On January 31, 2014, the "Tolleson Firefighters" posted a message on their Facebook page with a link to information about the meet and confer policy. (PSOF, Ex. AA, Tolleson Firefighters Facebook Page.) The union also drafted a Meet and Confer Proposal and a

1    Meet and Confer Draft Ordinance, but they are not dated, and there is no evidence of

2    when they were created. (PSOF, Ex. Y, Tolleson Meet and Confer Proposal; PSOF, Ex.

3    Z, Meet and Confer Draft Ordinance; Hamm Dep. at 38:6-39:4.) The Meet and Confer

4    Proposal states that City of Tolleson employees want a policy "[t]o facilitate a process in

5    which we can sit down with City Management and discuss our issues in a

6    positive/productive manner." (Meet and Confer Proposal.) The Meet and Confer Draft

7    Ordinance states that the scope of the meet and confer process "covers wages, hours,

8    benefits and working conditions." (Meet and Confer Draft Ordinance.)

9          On September 24, 2014, Plaintiffs Mr. Hamm and Mr. Candelaria brought this

10    action against Defendants raising three claims: (1) unlawful retaliation for Plaintiffs'

11    exercise of their First Amendment right to speak out about matters of public concern, (2)

12    unlawful retaliation for Plaintiffs' exercise of their First Amendment right to freedom of

13    association, and (3) unlawful retaliation for Plaintiffs' exercise of their rights under

14    A.R.S. § 23-1411 to associate with other firefighters who are union members. (Compl.

15    ¶¶ 42, 49, 56-57.) Defendants now move for Summary Judgment as to all of Plaintiffs'

16    claims against them.

17    **II.    LEGAL STANDARD**

18          Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is

19    appropriate when: (1) the movant shows that there is no genuine dispute as to any

20    material fact; and (2) after viewing the evidence most favorably to the non-moving party,

21    the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v.*

22    *Catrett*, 477 U.S. 317, 322-23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285,

23    1288-89 (9th Cir. 1987). Under this standard, "[o]nly disputes over facts that might affect

24    the outcome of the suit under governing [substantive] law will properly preclude the

25    entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

26    A "genuine issue" of material fact arises only "if the evidence is such that a reasonable

27    jury could return a verdict for the nonmoving party." *Id.*

28

1    In considering a motion for summary judgment, the court must regard as true the
2    non-moving party's evidence, if it is supported by affidavits or other evidentiary material.
3    *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289. However, the non-moving party
4    may not merely rest on its pleadings; it must produce some significant probative evidence
5    tending to contradict the moving party's allegations, thereby creating a material question
6    of fact. *Anderson*, 477 U.S. at 256-57 (holding that the plaintiff must present affirmative
7    evidence in order to defeat a properly supported motion for summary judgment); *First
8    Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

9    "A summary judgment motion cannot be defeated by relying solely on conclusory
10   allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.
11   1989). "Summary judgment must be entered 'against a party who fails to make a showing
12   sufficient to establish the existence of an element essential to that party's case, and on
13   which that party will bear the burden of proof at trial.'" *United States v. Carter*, 906 F.2d
14   1375, 1376 (9th Cir. 1990) (quoting *Celotex*, 477 U.S. at 322).

15   **III.    ANALYSIS**

16   Plaintiffs' Complaint alleges that by taking disciplinary action against them,
17   Defendants unlawfully deprived them of their rights under the United States Constitution
18   and Arizona state law and subjected them to unlawful retaliation in violation of 42 U.S.C.
19   § 1983 and A.R.S. § 23-1411(A). (Doc. 1, Compl. ¶ 1-2.) Plaintiffs specifically contend
20   that Defendants unlawfully retaliated against them for exercising their rights to: (a) speak
21   about matters of public concern, (b) participate in an association and its related activities
22   involving matters of public concern, and (c) join an employee association for public
23   safety employees. (Compl. ¶¶ 42, 47, 54-55.)

24   **A.    Plaintiffs' First Amendment Claims**

25   Plaintiffs argue that the adverse employment actions taken against them were
26   "taken in response to, and in retaliation for, the [P]laintiffs' exercise of their
27   constitutional and lawful rights to speak out about matters of public concern" and their
28   "rights to freedom of association" in violation of the First and Fourteenth Amendments.

(Compl. ¶¶ 42, 49.) The Ninth Circuit Court of Appeals has created a five-step inquiry to determine whether an employer unlawfully retaliated against an employee for engaging in protected speech. *Robinson v. York,* 566 F.3d 817, 822 (9th Cir. 2009). First, "the plaintiff bears the burden of showing: (1) whether the speech addressed an issue of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; and (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action." *Id.* (internal citations and quotations omitted). "[I]f the plaintiff has satisfied the first three steps, the burden shifts to the government to show: (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected conduct." *Id.* The Court notes that the Ninth Circuit has collectively analyzed freedom of speech and freedom of association claims in the third prong of the five-step inquiry when both claims are asserted. *See, e.g., McKinley v. City of Eloy*, 705 F.2d 1110, 1115 (9th Cir. 1983). The parties do the same in their briefs, and the Court will address Plaintiffs' First Amendment claims collectively in section two below.

### 1.    Speech That Addresses an Issue of Public Concern

Speech involves an issue of public concern when it can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Connick v. Myers,* 461 U.S. 138, 147 (1983). To make this determination, a court must look at "the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147-48. This "inquiry into the protected status of speech is one of law, not fact." *Id.* at 147-48 n.7. Speech that addresses "individual personnel disputes and grievances" that "would be of no relevance to the public's evaluation of the performance of governmental agencies" generally is not of public concern. *McKinley*, 705 F.2d at 1114.

Plaintiffs present evidence of their speech relating to two alleged union activities—the Yarnell Hill Fire relief effort and efforts to institute a meet and confer policy—and claim that such speech is protected. (Resp. at 5-8.) In support of their

position, Plaintiffs assert that "[m]ultiple courts have concluded that speech on behalf of labor unions is *prima facie* protected by the First Amendment." (Resp. at 5.) This assertion is misleading. In fact, the cases Plaintiffs cite support the opposite conclusion— that speech on behalf of labor unions is not *prima facie* protected. One case Plaintiffs cite states "an employee's speech, activity or association, merely because it is union-related, does not touch on a matter of public concern as a matter of law." *Boals v. Gray*, 775 F.2d 686, 693 (6th Cir. 1985). Another case concludes "[t]he fact that the speech . . . relate[s] to union matters is not sufficient by itself to dispense with full-dress *Connick* analysis." *Davignon v. Hodgson*, 524 F.3d 91, 101 (1st Cir. 2008). Moreover, none of the cases Plaintiffs cite are from the Ninth Circuit, and thus Plaintiffs present no binding case law. Accordingly, Plaintiffs' speech is not *prima facie* protected, and the Court will analyze the speech under *Connick*.

### a.    Plaintiffs' Speech Relating to the Yarnell Hill Fire Tragedy

Plaintiffs contend that their speech following the Yarnell Hill Fire tragedy "constituted speech on a matter of public concern" because "PPFA wanted union member volunteers *only* to ensure that fire fighters did not 'freelance,' which would have presented a safety issue." (Resp. at 7) (emphasis in original). The Court interprets PPFA's reference to "freelancing" as a concern that if firefighters acted independently to fight the Yarnell Hill Fire, there could be safety and management problems. Plaintiffs describe two main incidents of speech that occurred after the Yarnell Hill Fire tragedy. First, Mr. Candelaria told Mr. Franzmeier that he could not sign up to volunteer because he was not a union member. Second, Mr. Candelaria and Mr. Hamm had a conversation about Mr. Mecum's crew possibly being rejected from relief efforts in Prescott, and Mr. Hamm relayed this message to Mr. Mecum.

Plaintiffs cite *Gilbrook v. City of Westminster* for the proposition that speech regarding a "fire department's ability to respond effectively to life-threatening emergencies" addresses a matter of public concern. 177 F.3d 839, 866 (9th Cir. 1999). In *Gilbrook*, the plaintiff firefighters brought an action against their employer for retaliating

against them for exercising their First Amendment rights of free speech and association. *Id.* at 847. The plaintiffs were members of a union that had been protesting against proposed reductions to the city's fire services. *Id.* Despite the union's protests, the city council voted to reduce fire services. *Id.* Thereafter, a residential fire resulted in the death of a child, and the union issued a press release pointing to the city council's changes as the cause of the preventable death. *Id.* at 850. The court found that "there can be little doubt that [plaintiff's] statement to the press in the wake of the Candlewood Fire addressed a matter of public concern: the fire department's ability to respond effectively to life-threatening emergencies." *Id.* at 866.

This case is distinguishable from *Gilbrook*, because Plaintiffs' speech did not question the Tolleson fire department's ability to respond to life-threatening emergencies that affect the public. Unlike the incident in *Gilbrook*, there is no possibility that the initial incident—the Yarnell Hill Fire tragedy—was caused by policies implemented by the City of Tolleson which Plaintiffs sought to advise the public about. Here, Plaintiffs' speech questioned Chief Good's personnel decisions regarding relief assistance. Although Plaintiffs argue such personnel decisions and the potential for "freelancing" could affect public safety, they have produced no evidence to suggest that having non-union members on the relief crew—here, just one non-union member—had the potential to cause safety issues. In addition, unlike the speech in *Gilbrook*, Plaintiffs' speech was made privately to other firefighters, and Plaintiffs made no attempts to publicize their alleged safety concerns. Consequently, Plaintiffs' speech about the Yarnell Hill Fire tragedy is more aptly characterized as speech that addresses "individual personnel disputes and grievances" that "would be of no relevance to the public's evaluation of the performance of governmental agencies," and therefore, is not of public concern. *McKinley*, 705 F.2d at 1114.

Furthermore, Plaintiffs' speech about the management of relief efforts was made with governmental authority that they did not possess. Unauthorized and insubordinate employee speech that "purports to exercise governmental authority over others" is not

protected by the Constitution. *See Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1080-81 (9th Cir. 1996) (finding college employee who gave unauthorized orders to stop hiring in certain departments not to be protected by the First Amendment). Through their directions to Mr. Mecum that the City fire truck might be rerouted if a non-union member was on board, Plaintiffs' speech purported to exercise governmental authority. Although there was some confusion immediately following the tragedy that may have led Plaintiffs to believe that the union and not the City was organizing relief efforts, (*see* Jeffries Dep. at 48:22-49:5), by the time Plaintiffs decided that Mr. Hamm would tell Mr. Mecum the truck might be rerouted because of non-union member volunteers, Plaintiffs were well aware that the City fire department, under the direction of Chief Good, was organizing relief efforts. Furthermore, to the extent Plaintiffs had authority as union leaders, it did not supersede the authority that Chief Good possessed as Chief of the City's fire department. In sum, at the time Plaintiffs relayed the message to Mr. Mecum, only Chief Good had authority to give orders about the City's relief assistance to Prescott, and Plaintiffs' speech was unauthorized and therefore not protected. (*See* Tolleson Police Memorandum at 18.)

In sum, Plaintiffs' speech relating to the Yarnell Hill Fire tragedy is not protected by the First Amendment because it involved individual personnel disputes and was insubordinate and unauthorized. *See McKinley*, 705 F.2d at 1114; *Nelson*, 83 F.3d at 1080-81.

**b.    Plaintiffs' Speech Relating to the Meet and Confer Policy**

Plaintiffs also claim that their speech advocating for the City to adopt a meet and confer policy addresses matters of public concern. (Resp. at 6.) The Ninth Circuit has held that speech about the working conditions of public employees addresses issues of public concern. *McKinley*, 705 F.2d at 1114 (finding plaintiff's speech about compensation for city police force addressed matter of public concern because it involved the "working relationship between the police union and elected city officials"). According to the Meet and Confer Draft Ordinance, the meet and confer policy would

1  allow the union to submit proposals to the City Manager regarding "wages, hours,

2  benefits and working conditions." (Meet and Confer Draft Ordinance.) Since these issues

3  address the working relationship between the firefighters' union and an elected city

4  official, they constitute an issue of public concern. Therefore, Plaintiffs have raised a

5  material issue of fact as to whether the content of their speech addresses a matter of

6  public concern.

7      But the Court must also consider the context and form of the speech under the

8  *Connick* test. Plaintiffs have failed to present a genuine issue for trial as to whether the

9  form and context of their speech regarding the proposed meet and confer policy are such

10 that it involves a matter of public concern. Courts have held that public employees'

11 speech about their employment conditions involves a matter of public concern when it is

12 made publicly. *See, e.g.*, *McKinley*, 705 F.2d at 1112 (plaintiff's speech purposefully

13 directed to the public through city council meetings and television interview); *Lambert v.*

14 *Richard*, 59 F.3d 134, 137 (9th Cir. 1995) (plaintiff spoke at televised city council

15 meeting); *Gilbrook*, 177 F.3d at 850 (plaintiffs issued a press release). Plaintiffs present

16 insufficient evidence that their speech about a meet and confer policy was directed to the

17 public or otherwise made publicly. Rather than advocating for a meet and confer policy at

18 a city council meeting or some other public forum, Mr. Candelaria spoke privately with

19 City Manager Mr. Medrano, Chief Good, and possibly some city council members.

20 (Candelaria Dep. at 77:15-22.) He testified that he never spoke about a meet and confer

21 policy around members of the public. (Candelaria Dep. at 77:23-25, 78:1-20.) Plaintiffs

22 present no other evidence that they brought their advocacy for a meet and confer policy

23 into the public sphere. In sum, given the evidence of the context and form of Plaintiffs'

24 speech about the proposed meet and confer policy—speech made privately to a

25 governmental entity—no reasonable juror could find that it involved a matter of public

26 concern. *See Roe v. City & Cty. of San Francisco*, 109 F.3d 578, 585 (9th Cir. 1997)

27 (upholding defendants' motion for summary judgment when plaintiff's "speech was not

28

directed to the public or the media, but rather to a governmental entity") The speech therefore does not address an issue of public concern as a matter of law.[1]

Plaintiffs present other evidence of speech about a meet and confer policy but do not provide sufficient detail to establish a genuine issue of material fact about whether the speech was made by them or whether it addresses a matter of public concern. The Meet and Confer Proposal and the Meet and Confer Proposed Ordinance are not signed or dated, and there is no evidence of who wrote them, when they were created, or where—or even if—they were disseminated. (Meet and Confer Proposal; Meet and Confer Proposed Ordinance.) There is also no evidence that Plaintiffs wrote the Facebook post from "Tolleson Firefighters" about the proposed meet and confer ordinance. (Tolleson Firefighters Facebook Page.) This additional evidence therefore does not raise a material issue of fact that Plaintiffs' speech regarding the proposed meet and confer policy involved a matter of public concern.

In conclusion, Plaintiffs have not provided sufficient evidence from which reasonable jurors could find that their speech relating to the Yarnell Hill Fire relief efforts or the proposed meet and confer policy involved a matter of public concern. Accordingly, Plaintiffs have not established a genuine issue of material fact under the first step of the five-step First Amendment inquiry.[2]

**2.       Substantial or Motivating Factor in the Adverse Action**

Even if Plaintiffs could prove that their speech regarding the proposed meet and confer was protected under the First Amendment, they fail to provide sufficient evidence

---

[1] Plaintiffs cite *Rankin v. McPherson* for the proposition that "a purely private statement on a matter of public concern will rarely, if ever, justify discharge of a public employee." 483 U.S. 378, 388 n.13 (1987). The speech in *Rankin* occurred during a conversation between coworkers about the policies of the President's administration following an assassination attempt on the President. *Id*. at 386. It was undisputed that the plaintiff was discharged based on the content of her speech. *Id*. at 390. The case here is distinguishable because: (1) Plaintiffs' speech did not involve an issue of national concern, (2) Plaintiffs were not discharged, and (3) Defendants dispute Plaintiffs' allegation that they were retaliated against as a result of their speech.

[2] Although the Court need not address any further steps in the inquiry, it will address step three to evaluate specific issues regarding Plaintiffs' freedom of association claim. The Court does not consider step two because steps one and three are dispositive.

for a reasonable jury to conclude that this speech was a "substantial or motivating factor" in Defendants' decision to take the adverse actions. Under the Ninth Circuit test for establishing that retaliation was a "substantial or motivating factor" of an adverse employment action, plaintiffs may introduce evidence that: (1) the protected speech and adverse action were proximate in time, such that a jury could infer that the adverse action was done in retaliation for the speech, (2) the employer expressed opposition to the speech, or (3) the employer's explanation for the adverse action was false and pretextual. *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003).

The Court notes that Plaintiffs allege their freedom of association claim is based on substantially the same facts as their freedom of speech claim. (Compl. ¶ 46.) In their freedom of association claim, Plaintiffs aver they were retaliated against because they "actively participated in the [union]" and "acted as the leaders and spokespersons for the [union]," when the union "was engaged in an effort to secure passage of a meet-and-confer ordinance in the City." (Compl. ¶¶ 47-48.) In a case where the "speech and associational rights at issue . . . are so intertwined that [there is] no reason to distinguish [a] hybrid circumstance from a case involving only speech rights," courts may analyze the claims together. *Hudson v. Craven*, 403 F.3d 691, 698 (9th Cir. 2005). The Ninth Circuit has taken this approach in analyzing retaliation claims involving union members. *See, e.g.*, *McKinley*, 705 F.2d 1110 at 1115. Since the facts underlying Plaintiffs' First Amendment speech and association claims are substantially the same, the Court will analyze the claims collectively under the causation test.

Plaintiffs contend that the union's "hard push," or intensified advocacy efforts, for a meet and confer policy began "within months of the City's investigation and discipline of plaintiffs," and therefore, they "can demonstrate a temporal proximity" between their speech and association regarding the meet and confer policy and the adverse actions. (Resp. at 10.) Plaintiffs, however, had been advocating for a meet and confer policy since Mr. Candelaria became union president more than 10 years earlier. (Candelaria Dep. at 47:14-27, 48:16-17.) In addition, Mr. Jeffries testified that there had been no additional

1    efforts that might be characterized as a "hard push" to pass a meet and confer policy in

2    the City during the time frame that supports Plaintiffs' allegation of a "hard push."

3    (Jeffries Dep. at 17:20-18:18.) A reasonable jury could not infer, based upon the limited

4    evidence of Plaintiffs' speech and association regarding the "hard push," that Defendants

5    suddenly decided to retaliate against Plaintiffs for advocating for a policy that was

6    proposed over a decade ago.

7         Plaintiffs also allege that "their employer expressed opposition to their speech"

8    about the proposed meet and confer policy. (Resp. at 10.) The only evidence Plaintiffs

9    have produced about their employer's opposition to their speech was a 2008 email from

10   Mayor Gamez to Mr. Candelaria, written in response to an email that Mr. Candelaria

11   wrote that advocated for a meet and confer policy. (May 1, 2008 Email.) This sole email,

12   written five years before the adverse actions occurred, is insufficient for a reasonable

13   juror to conclude that Plaintiffs' speech about meet and confer was a "substantial and

14   motivating factor" in the adverse actions.

15        Finally, Plaintiffs claim that their employer's explanation for the adverse action

16   was false and pretextual. (Resp. at 11.) Plaintiffs state that the pretext for the adverse

17   action was "concern for another employee, Mr. Franzmeier." (Resp. at 11.) However,

18   Plaintiffs present no evidence to support their bare allegation that Defendants used

19   concern for Mr. Franzmeier as a pretext in Plaintiffs' adverse employment actions. The

20   evidence instead shows that Plaintiffs were disciplined for violating administrative policy

21   because of their attempts to prevent Mr. Franzmeier from participating in the City's relief

22   crew to Prescott. (Candelaria Dep. at 24:14-16; Good Decl. ¶ 5.) Plaintiffs themselves

23   expressed remorse about their treatment of Mr. Franzmeier. After the volunteer sign-up

24   sheet incident, Mr. Candelaria apologized to Mr. Franzmeier for upsetting him.

25   (Candelaria Dep. at 24:14-16; Good Decl. ¶ 5.) Mr. Candelaria later told Mr. Medrano

26   that "the emotions of the day may have gotten . . . [sic] the day the 19 firemen died and

27   maybe I could have handled that a little better." (Good Decl. ¶ 6.) During his disciplinary

28   meeting, Mr. Hamm acknowledged that he "learned something" and described it as a

"growing experience." (Good Decl. ¶ 15.) He also said he "would understand if [Chief Good] would have a trust issue" because of his conduct. (Good Decl. ¶ 18.) Plaintiffs have presented no significant probative evidence to contradict Defendants' allegations that Plaintiffs' inappropriate actions after the Yarnell Hill Fire Tragedy caused legitimate concerns that warranted the adverse actions.

In sum, even assuming that Plaintiffs' speech about a meet and confer policy was protected, Plaintiffs have not provided sufficient evidence to create a genuine issue of material fact that their activities relating to the meet and confer policy, and not their behavior following the Yarnell Hill fire tragedy, were the cause of the adverse actions taken against them. Since Plaintiffs have not shown sufficient evidence for a reasonable jury to find that their protected activities relating to the meet and confer policy were a "substantial and motivating factor in the adverse action," the evidence does not satisfy step three of the five-step inquiry.

Because Plaintiffs have not produced significant probative evidence contradicting Defendants' evidence under steps one and three of the five-step inquiry, the Court need not address the final two steps of the inquiry.[3] The Court grants Defendants' Motion for Summary Judgment as to Plaintiffs' First Amendment claims of freedom of speech and freedom of association.

### B.    Plaintiffs' State Law Claim

Plaintiffs also contend that Defendants violated their associational rights as public safety employees under Arizona state law. (Compl. ¶ 54-55.) The Arizona Revised Statutes state that public safety employees "shall not be discharged, disciplined or discriminated against because of the exercise" of their rights, as "[p]ublic safety employees serving any city, town, county or fire district . . . [to] . . . join employee associations which comply with the laws of this state." A.R.S. § 23-1411(A). Plaintiffs specifically contend that Defendants have "taken actions and made threats aimed at

---

[3] Since Plaintiffs have failed to show that there is a genuine issue of material fact as to whether Defendants violated Plaintiffs' First Amendment rights, the Court also need not address Defendant's qualified immunity argument.  (MSJ at 14.)

1   unlawfully preventing and limiting the plaintiffs' rights to associate with other . . .

2   employees who are labor Association members about matters of common interest."

3   (Compl. ¶ 56.)

4        Plaintiffs' evidence fails to present a genuine issue of material fact as to the

5   alleged causal connection between their membership in a public safety employee union

6   and the adverse actions taken against them.[4] In recent Arizona cases, courts have adopted

7   the First Amendment retaliation test for analyzing Arizona state law claims of retaliation.

8   *See Rowberry v. Wells Fargo Bank NA*, No. CV-14-01801-PHX-DLR, 2015 WL

9   7273136 (Nov. 18, 2015, D. Ariz.). Plaintiffs' claim fails under the First Amendment

10   retaliation test because, as discussed above, they have not produced sufficient evidence

11   for a reasonable jury to find that their association with the union was a "substantial or

12   motivating factor" in the adverse actions. Therefore, their retaliation claim under state

13   law fails as well.[5]

14        Accordingly, for the foregoing reasons,

15        IT IS ORDERED granting Defendant's Motion for Summary Judgment (Doc. 61)

16   as to all of Plaintiffs' claims against them.

17        IT IS FURTHER ORDERED that the Clerk is directed to enter judgment

18   consistent with this Order and close this case.

19        Dated this 8th day of July, 2016.

21        _____
22        Honorable John J. Tuchi
          United States District Judge

---

26   [4] Neither party presents a case that sets forth a retaliation test under A.R.S. § 23-1411(A), and the Court is unable to find one.

27   [5] Since Plaintiffs have not established a genuine issue of material fact about their substantive claim under A.R.S. § 23-1411(A), the Court need not address the related procedural issue raised by Defendants. (MSJ at 16-17.)